UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

KATHLEEN P. Z.,                                    Case No. 18-cv-3108 (ECW)

      Plaintiff,

  v.                                             **ORDER**

ANDREW SAUL, Commissioner
of Social Security,

      Defendant.

This matter is before the Court on Plaintiff Kathleen P.Z.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 12) and Defendant Commissioner of Social Security Andrew Saul's ("Defendant") Motion for Summary Judgment (Dkt. 14). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits. For the reasons stated below, Plaintiff's Motion is denied, and Defendant's Cross-Motion is granted.

## I.    BACKGROUND

Plaintiff filed a Title II application for disability insurance benefits ("DIB") alleging disability beginning on November 7, 1998. (R. 11, 31 166-169.)[1] Plaintiff later amended her alleged disability onset date from November 7, 1998 to February 21, 2000. (R. 11, 31.) Plaintiff's last day of insured was December 31, 2004. (R. 13.) Her application was denied initially and on reconsideration. (R. 87-91, 92-94.) Plaintiff

---

[1]     The Social Security Administrative Record ("R.") is available at Dkt. 11.

requested a hearing before an administrative law judge ("ALJ"), which was held on July 31, 2018 before ALJ Peter Beekman. (R. 11.) The ALJ issued an unfavorable decision on February 21, 2018, finding that Plaintiff was not disabled through December 31, 2004, the last date of insured. (R. 8-22.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since February 21, 2000, through her date last insured of December 31, 2004. (R. 13.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: Irritable Bowel Syndrome ("IBS"); Interstitial Cystitis ("IC"); and Ischemic Heart Disease. (R. 13.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. 15-16.)

---

[2] The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"): to perform the full range of light work as defined in 20 CFR 404.1567(b).[3] (R. 16.)

At the fifth step of the sequential analysis, and based on the testimony of the vocational expert ("VE"), the ALJ found that through the date last insured, considering the Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was capable of making a successful adjustment to work that existed in significant numbers in the national economy including Counter Clerk (generally at the light exertional level, unskilled) DOT #249.366-010; Retail Sales Attendant (generally at the light exertional level, unskilled) DOT #299.677-010); and Assembler, Small Products (generally at the light exertional level, unskilled) DOT #706.684-022. (R. 21.) Accordingly, the ALJ deemed Plaintiff not disabled. (R. 22.)

Plaintiff requested review of the decision. (R. 4.) The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the

---

[3] Pursuant to the Social Security regulations, light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Commissioner. (R. 1-3.) Plaintiff then commenced this action for judicial review. The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II. RELEVANT RECORD

**A. Medical Record**

On February 21, 2000, Plaintiff had a urinary biopsy performed. (R. 280.) The biopsy findings were consistent with interstitial cystitis.[4] (R. 280.)

On September 12, 2002, Plaintiff was seen at the emergency room related to left leg numbness. During the consultation, Plaintiff represented that she was experiencing left leg weakness "without urinary or bowel complaints." (R. 396.) She denied any new change in bowel or bladder neurological control other than being constipated after surgery and having loose stools. (R. 422, 928.)

On April 15, 2004, Plaintiff presented to Brian Kelly, M.D., with a number of complaints, including complaints of IBS, which she described as being "pretty bad lately." (R. 311.) Plaintiff noted problems with constipation, diarrhea, gassiness, pain,

---

[4] Interstitial cystitis ("IC"), also called bladder pain syndrome, "is a chronic, or long-lasting, condition that causes painful urinary symptoms. Symptoms of IC may be different from person to person. For example, some people feel mild discomfort, pressure, or tenderness in the pelvic area. Other people may have intense pain in the bladder or struggle with urinary urgency, the sudden need to urinate, or frequency, the need to urinate more often." Definition & Facts of Interstitial Cystitis, *found at* https://www.niddk.nih.gov/health-information/urologic-diseases/interstitial-cystitis-painful-bladder-syndrome/definition-facts.

and cramping. (R. 311.) Plaintiff was taking Bentyl and was interested in having another colonoscopy if indicated. (R. 311.) In addition, Plaintiff reported that her bladder had been acting up, and suspected that this was her IC, but she chronically felt as though she had a bladder infection. (R. 311.) Plaintiff wanted to consult with a urologist. (R. 311.)

On May 6, 2004, Plaintiff was seen in part for symptoms of IBS. (R. 309.) It was noted that Plaintiff had significant constipation symptoms and was taking Bentyl four times a day. (R. 309.) Plaintiff complained of significant abdominal cramping, occasional blood in her stools, which was described as bright red bleeding only after constipation, and alternatively diarrhea. (R. 309.) A colonoscopy was indicated for her IBS and intermittent gastrointestinal bleeding. (R. 310.)

On May 24, 2004, Plaintiff saw Dr. Kelly for a follow-up regarding her mental health. (R. 308.) She reported that taking Zoloft was helpful with her emotional state, but it had not been of any help for her IC symptoms. (R. 308.) Her urinary symptoms were particularly bad, and she believed that she was suffering from a bladder infection. (R. 308.) Dr. Kelly wanted to get Plaintiff seen by an IC specialist from the Mayo Urology Department. (R. 308.) Dr. Kelly diagnosed Plaintiff with a possible urinary tract infection. (R. 308.)

On July 2, 2004, Plaintiff was seen for a urology appointment by Deborah Lightner, M.D. (R. 405, 900.) Plaintiff claimed that she was voiding during the day every one and a quarter hours. (R. 405.) Attempts to hold her urine would result in pain. (R. 405.) Plaintiff noted no significant incontinence with at most a few drops of urine. (R 405.) Plaintiff also reported IBS, which involved having loose crampy stools on a

5

weekly basis, but that her IBS was improved with the use of Bentyl. (R. 405.) Plaintiff subsequently had a uroflow performed which showed a normal functional bladder capacity of over 175 cc on a spontaneous void. (R. 406.)

On August 12, 2004, Plaintiff was seen by Yuri Saito Loftus, M.D., for her IBS. (R. 402.) Plaintiff represented that her IBS was clearly related to stress over the previous 10 to 15 years, initially with her job in banking, and more recently due to home issues related to taking care of troubled foster children. (R. 402.) Plaintiff also noted problems with IC on a chronic basis, including pelvic pain following a hysterectomy in 1985. (R. 402.) Plaintiff claimed that her bladder problem was always there and would be triggered by an IBS episode. (R. 402.) Her bowel habits were such that she had a bowel movement once every ten days or so. (R. 402.) Plaintiff would generally trigger a bowel movement by drinking a carbonated drink or eating something with MSG, which would then stimulate powerful cramps and a bowel movement. (R. 402.) According to Plaintiff, she would then have a two-week time period where she would have three to five formed bowel movements a day that necessitated her needing to be home near a bathroom. (R. 402.) With this, she had bloating, left lower quadrant discomfort, back discomfort, and a constant sensation of incomplete evacuation. (R.402.) It was noted that she had a colonoscopy in June 2004 that was unremarkable. (R. 402.) Plaintiff was taking Bentyl. (R. 402.) Dr. Loftus found that Plaintiff's symptoms were quite classic for IBS, and believed Plaintiff had pelvic floor dysfunction on exam. (R. 403.) Dr. Loftus believed that it would be worth treating the pelvic floor dysfunction with physical therapy. (R. 403.)

On the same day, Plaintiff underwent physical therapy for her pelvic floor tension myalgia. (R. 430.) Plaintiff described her bladder/pelvic pain as an infection that she had all the time, feeling as though she had to go to the bathroom all the time, and experiencing a hurting, burning pain in her lower pelvis after she went to the bathroom. (R. 430.) Plaintiff also reported that she only was able to urinate small amounts, and she would have pain if she had to hold her urine for any amount of time. (R. 430.) She described her life as going from one bathroom to another, and she experienced incontinence when she laughed, coughed, or sneezed. (R. 430.) Plaintiff also reported IBS, with bowel movements three times a day. (R. 430.) Plaintiff felt like she had to go to the bathroom when she moved or walked around, and she experienced "diarrhea spasms" associated with this condition. (R. 430.) The treatment plan included a pelvic floor treatment program, which she underwent on September 13 and 14, 2004. (R. 428-30.)

On September 16, 2004, Plaintiff was seen for a complaint of diarrhea. (R. 303.) She had recently undergone a test at Mayo for her bladder. (R. 303.) She was hooked up to a device that measured the contraction and relaxation of her pelvic floor muscles by giving her large electrical shocks, thereby causing her IBS to act up. (R. 303.) She was eating fine, keeping fluids down and urinating as per her usual routine, but she had experienced what Plaintiff referred to as her classic headache and dizziness. (R. 303.) The assessment for Plaintiff was dehydration due to IBS and she was admitted to the hospital on an outpatient basis to infuse her with 2 liters of saline. (R. 303.)

On October 18, 2004, Plaintiff saw Dr. Kelly for a number of issues including her IBS. (R. 301.) Plaintiff reported that during the previous month she decided that she might be over-medicated, so she self-discontinued all her medications. (R. 301.) As a result, Plaintiff had a number of problems, including a flare-up of her IBS with a lot of diarrhea, causing her to become dehydrated. (R. 301.) As a result, Plaintiff was given 2 liters IV fluid on an outpatient basis. (R. 301.) Plaintiff claimed to Dr. Kelly that she was back on some, but not all of her medications. (R. 301.) Dr. Kelly told Plaintiff that he believed that it was worth her trying to get her back on Bentyl for her diarrhea. (R. 301.) Dr. Kelly told Plaintiff that she could gradually taper back this medication to the lowest effective maintenance dosage once her the diarrhea was under control and continue to take Lomotil if she had problems with breakthrough diarrhea. (R. 301.)

On November 30, 2004, Plaintiff presented to Dr. Kelly for a periodic assessment. (R. 299.) It was noted that Plaintiff "has been feeling quite good in general." (R. 299.) It was also reported that her "bowels are doing well now, pretty much almost normal. She is not using Bentyl and is taking Lomotil one tablet b.i.d." (R. 299.) In addition, Plaintiff reported she still had "some symptoms" of IC, including a feeling of suprapubic discomfort or pressure. (R. 299.) Plaintiff's examination showed that she was not in any acute distress. (R. 299.)

On July 14, 2015, and again on September 24, 2015, State Agency medical doctors reviewed Plaintiff's medical record during the relevant time period and found that she could occasionally lift and carry lift 20 pounds, could frequently lift and carry 10

pounds, could stand or walk 6 hours in an 8-hour work day, sit for 6 hours in an 8-hour work day, and had no other physical limitations. (R. 60, 71.)

**B.     Testimony before the ALJ**

During the January 31, 2018 hearing before the ALJ, Plaintiff testified that she was first diagnosed with IC in the 90s. (R. 32.)  Plaintiff described her problems during the relevant time period as bladder spasms making it hard for her to retain her urine or even go to the bathroom. (R. 33.)  The condition also created cysts inside her bladder that would bleed and would trigger her IBS. (R. 33.)  The spasms would last for eight hours a day to the point where she would have to lie down and use a heating pad and do relaxing exercises for relief. (R. 33.)  Plaintiff did testify that she drove during this period, and offered conflicting testimony stating that her IC did not limit her driving, but then testified that it would cause her to pull over. (R. 33.)  Plaintiff noted that the Bentyl for her IBS limited her spasms, but it did not provide much relief because her bladder issue was separate. (R. 34.)

In terms of how the condition affected her ability to function on a daily basis, Plaintiff testified that she did not have any problems with taking care of herself. (R. 34.) Plaintiff's husband handled the household chores and shopping. (R. 34-35.)  Plaintiff's husband testified that he did all of the heavy household chores, while Plaintiff dusted and sometimes would put clothes away. (R. 46.)  Plaintiff's hobbies were limited to those she could perform seated, including scrapbooking. (R. 35-36.)  Walking was affected by Plaintiff's condition, as it caused spasms when the cysts would rub together. (R. 36.) Standing did not bother Plaintiff as long as she did not move. (R. 36.)  Sitting with a

9

heating pad helped to alleviate the pain. (R. 37.) Plaintiff also suffered from incontinence causing her to wear heavy pads or diapers that needed to be changed every two and a half to three hours. (R. 37.) The incontinence occurred without any warning. (R. 37-38.)

A day in the life of Plaintiff during this time involved getting her kids up, fixing them an easy breakfast and lunch, doing creative art activities with the kids, taking a two hour nap, calling her husband to arrange for supper, helping the kids with homework, and then going to sleep. (R. 41.) Plaintiff admitted she engaged in part-time work during this period involving managing a church office, bookkeeping, bringing in checks, and making deposits. (R. 40.) However, Plaintiff testified that she could not perform the work on a full-time basis. (R. 40-41.)

### III.  LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'" *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it

would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## IV. DISCUSSION

Plaintiff challenges two aspects of the Commissioner's decision: (1) that the ALJ's assessment of Plaintiff's RFC was contrary to law, because the ALJ did not assess the extent to which her IC and IBS limited her ability to perform work activities on a sustained basis as required by the regulations; and (2) that the ALJ erred in discounting Plaintiff's testimony describing her daily symptoms from IC and IBS and the extent to which they limited her ability to function. (Dkt. 13.) The Court will address each argument in turn.

### A. Whether the ALJ Properly Considered Plaintiff's IC and IBS when He Assessed Plaintiff's RFC

Plaintiff argues that the ALJ made an assessment concerning her ability to perform basic work activities without fully gaging how her condition might interrupt the normal workday due to frequent urination, the need to replace her Depends undergarment, or severe pain that might force her either to leave work early on a frequent basis, or be absent from work more than is allowed by most competitive employers. (Dkt. 13 at 13.) Plaintiff also asserts that the ALJ did not take into account the limitations posed by her IBS in assessing her with a light RFC. (*Id.* at 14-15.) According to Plaintiff, such circumstances are consistent with her testimony and the medical record. (*Id.* at 15.) Defendant counters that Plaintiff does not set forth what additional limitations should be

11

set forth in her RFC and that the ALJ's decision shows that he considered all of her impairments, and gave them due consideration in light of the lack of treatment and the improvement experienced by Plaintiff when she did seek out treatment. (Dkt. 15 at 6-9.)

A claimant's RFC is what he or she can do despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. *See Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Id.* at 1217 (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); *see also Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) ("[T]he burden of persuasion to prove disability and demonstrate RFC remains on the claimant."). The determination "that a claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner." *Vossen*, 612 F.3d at 1015 (citations omitted).

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations. *See Pearsall*, 274 F.3d at 1217; *see also Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (same) (citation omitted). The Eighth Circuit has held that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "[S]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that

addresses the claimant's ability to function in the workplace." *Id.* (quotation marks and citations omitted).

As a starting point, the Court concludes that as part of his RFC determination, the ALJ specifically considered Plaintiff's IBS (R. 18) and even found that "the claimant would be limited in her ability to stand, walk, and sit due the pain associated with interstitial cystitis." (R. 19.) To the extent that Plaintiff wanted more restrictions, she has failed to identify what those restrictions should be, and an "ALJ is not required to include restrictions in an RFC merely because he or she has determined, at step two of the sequential evaluation, that a claimant has a severe impairment." *Mary G. v. Berryhill*, No. 0:17-CV-03436-KMM, 2019 WL 1130173, at *2 (D. Minn. Mar. 12, 2019) (collecting cases). Indeed, an "RFC is not simply a laundry list of impairments and limitations." *Mark S. v. Saul*, No. 18-CV-02936-HB, 2020 WL 1043795, at *2 (D. Minn. Mar. 4, 2020) (quotation marks and citation omitted)). "Thus, the ALJ may distill what may be numerous impairments and limitations into a descriptive phrase, as long as it accurately captures a claimant's abilities in a work setting." *Id.* (citing *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (finding the ALJ's description of the claimant as "able to do simple, routine, repetitive work" adequately accounted for the claimant's borderline intellectual functioning)).

While Plaintiff asserts that her IBS and IC started in the 1990s (or possibly even earlier), there is no indication that Plaintiff sought any treatment for these conditions during the period of insured (starting on February 21, 2000) until April 2004. (R. 311.) The start date of her disability was when she had biopsy findings that were consistent

with IC. (R. 280.) If her IC and IBS were such severe limitations, then the record would have necessarily contained more evidence of her seeking treatment for her condition. Indeed, between this time period it appeared that she was doing well, as indicated by at least one treatment record in 2002, where it is noted that she was not experiencing urinary or bowel complaints. (R. 396.) This lack of medical treatment or otherwise conservative treatment for Plaintiff's IBS and IC between February 2000 and April 2004 supports the RFC. *See Buford v. Colvin*, 824 F.3d 793, 797 (8th Cir. 2016) ("[T]he conservative treatment, management with medication, and lack of required surgical intervention all support the ALJ's RFC determination.") (citation omitted).

Further, while Plaintiff complained of IBS symptoms, her colonoscopy was unremarkable as of June 2004 (R. 402), and her IBS was improved with the use of the medication Bentyl (R. 405).

Moreover, while Plaintiff offered contradicting reports in the medical record (and before the ALJ) regarding the level of her incontinence, she did report to her medical providers during this time period that she was suffering from no significant incontinence with at most a few drops of urine, and her tests showed she had a normal functional bladder capacity. (R. 405-06.) Plaintiff reported that imaging of her upper tract had been unremarkable and that she was able in the past to use Pyridium Plus with moderate success for her IC and felt that the trial of Detrol medication did give her some improvement of her leakage. (R. 405.)

In addition, while Plaintiff was seen in October 2014 at an acute care clinic for a flare-up of her IBS with a lot of diarrhea, causing her to become dehydrated, Plaintiff had

14

admitted that she on her own accord had stopped taking her medications. (R. 301.) At her appointment with Dr. Kelly it was suggested that she add the medication Bentyl for her diarrhea to her other IBS medication. (R. 301.) At the next exam, Plaintiff reported that she was not taking the Bentyl. (R. 299). In addition, she asserted that she was feeling quite good, her bowels were doing well (almost normal) and only complained of some symptoms of IC, involving discomfort or pressure. (R. 299.) The failure to take a medication related to her IBS and her improvement on her medications suggests that the level of impairments related to her IBS and IC was not any more significant than indicated in the light RFC propounded by the ALJ. *See Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) ("'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'") (quoting *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004)).

To the extent Plaintiff has cited some evidence in support of her contention that the RFC was incorrect, "substantial evidence to the contrary allowed the ALJ to make an informed decision." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012). The Court will not reverse the Commissioner even if, sitting as finder of fact, it would have reached a contrary result, as "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

**B.     The ALJ's Assessment of Plaintiff's Subjective Complaints**

As set forth above, the Commissioner must determine a Plaintiff's RFC based on all of the relevant evidence, including her own description of her limitations. *See Myers,*

15

721 F.3d at 527 (citation omitted). An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016)[5] (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms). But the ALJ need not explicitly discuss each factor. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

Plaintiff criticizes the ALJ's consideration of her subjective complaints on the basis that there is nothing in the medical record disputing her assertion of debilitating cramps (sometimes lasting for eight hours a day) resulting from her IC and IBS, which forced her to lie down for significant periods of time on a daily basis. (Dkt. 13 at 16-17.) Plaintiff also asserted that her purported limitations to her daily activities and her incontinence are similarly not contradicted by the medical record. (*Id*. at 17.)

---

[5] SSR 16-3p became effective on March 28, 2016 and supersedes SSR 96-7p. SSR 16-3p eliminates the use of the term "credibility" from the Social Security Administration's sub-regulatory policy, as the regulations do not use this term. In doing so, the Social Security Administration clarifies that subjective symptom evaluation is not an examination of an individual's character. Instead, the Social Security Administration will more closely follow the regulatory language regarding symptom evaluation." *Barbara M. v. Saul*, No. 18-CV-1749 (TNL), 2019 WL 4740093, at *7 n. 9 (D. Minn. Sept. 27, 2019) (cleaned up) (quoting *Krick v. Berryhill*, No. 16-cv-3782 (KMM), 2018 WL 1392400, at *7 n.14 (D. Minn. Mar. 19, 2018)).

Defendant argues that the ALJ did consider Plaintiff's subjective complaints and found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements were not entirely consistent with the medical evidence given that medical record did not evidence disabling limitations, and that her alleged symptoms were contradicted by her lack of treatment through a large portion of the period of disability and the fact that her symptoms appeared to be adequately controlled with prescribed medications. (Dkt. 15 at 11-13.)

While there is no dispute that the medical record supports Plaintiff's claim that she suffered from cramps resulting from her IC and IBS, and incontinence during the relevant period, the medical record supports the ALJ's findings that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in his decision. (R. 17-19.) As set forth above in Section IV.A of this Order, Plaintiff's conservative treatment and objective medical findings during the period she was insured are inconsistent with her debilitating subjective complaints. *See Crawford v. Colvin*, 809 F.3d 404, 410 (8th Cir. 2015) ("[T]he symptoms [the claimant] attested to are inconsistent with the objective medical evidence found on the record, and hence, need not be given great weight when considered against objective medical evidence.") (citation omitted). Especially telling is Plaintiff's decision to stop taking all her medications in September 2004 because she believed she was over-medicated. (R. 301.) One would not expect a person suffering from debilitating cramps and incontinence to take such drastic actions. In addition, the resulting improvement when

she went back on her medications also cuts against her subjective complaints. Further, while her doctor suggested that she add another medication for her IBS, Plaintiff ignored her doctor's advice, further placing into doubt the severity of her claimed subjective complaints. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005); *see also Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) (ALJ properly disregarded claimant's subjective complaints because her failure to use pain medication was inconsistent with allegations of disabling pain). With respect to her incontinence, the record simply does not support her claims that she had to change heavy pads every two and half to three hours, as she reported no significant incontinence to her provider, with only a dribbling loss of a few drops of urine at a time (R. 405), that she experienced incontinence with respect certain triggers like laughing, coughing, and sneezing (R. 430), and that as late as November 2004, she was only reporting "some symptoms" of her IC involving discomfort or pressure. (R. 299.)

As it relates to Plaintiff's daily activities of living, Plaintiff claimed very limited activities. (R. 34-41.) However, Plaintiff testified that she took care of her children, which included three foster children (three of which it appears she adopted). (R. 41, 311.) This testimony supports the ALJ's findings that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (affirming ALJ's discount of claimant's subjective complaints of pain where the claimant was able to care for one of his children on daily basis). This, coupled with her testimony that she worked, albeit part-time, at her

church on tasks involving managing the office, bookkeeping, bringing in checks, and making deposits (R. 40), cuts against Plaintiff's claims of debilitating subjective complaints. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) ("Seeking work and working at a job while applying for benefits, are activities inconsistent with complaints of disabling pain.") (citing *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996); *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995)).

In sum, based on the evidence in the record as a whole, including Plaintiff's subjective complaints, the Court finds that the ALJ's RFC is supported by substantial evidence.

## V. ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1. Plaintiff Kathleen P.Z.'s Motion for Summary Judgment (Dkt. 12) is **DENIED**;

2. Defendant Commissioner of Social Security Andrew Saul's Motion for Summary Judgment (Dkt. 14) is **GRANTED**; and

3. This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 27, 2020          *s/ Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge